UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BEVERLY GROSE, f/n/a
BEVERLY HARRINGTON,

                Plaintiff,

v.                                CASE NO. 06-15175

CORRECTIONAL MEDICAL      DISTRICT JUDGE GEORGE C. STEEH
SERVICES, PATRICIA
CARUSO, JOAN YURKINS,      MAGISTRATE JUDGE DONALD A. SCHEER
BRUCE CURTIS, SHERILYN
BUTLER, GOPAL K. SINGHAL,
JANE BURCH, and
DR. CRAIG HUTCHINSON,

                Defendants.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### RECOMMENDATION:

Defendants Singhal, Burch, Hutchinson and Correctional Medical Services' Motion For Summary Judgment should be GRANTED, as Plaintiff has failed to establish any violations of her federally secured constitutional rights by deliberate indifference to her serious medical needs.

\*   \*   \*

Plaintiff, formerly incarcerated at a Michigan Department of Corrections (MDOC) boot camp in Cassidy Lake, Michigan, filed a Third Amended Complaint, by and through retained counsel, pursuant to 42 U.S.C. § 1983, on July 10, 2008, against the above named defendants, alleging that they had been deliberately indifferent to her serious medical needs. Plaintiff asserts that she was denied adequate medical care for bilateral

fractures of her knees while in MDOC custody. Claiming violations of her Eighth Amendment rights under the federal Constitution, Plaintiff sought compensatory and punitive damages.

Defendants Singhal, Burch, Hutchinson and Correctional Medical Services, Inc.,(CMS) filed a Motion to Dismiss and for Summary Judgment on September 23, 2008. (Docket #107). Defendants denied any deliberate indifference to a serious medical need. They maintained that they were not deliberately or wantonly indifferent to Plaintiff's serious medical needs, and that they did not knowingly refuse to provide urgently needed medical care so as to cause residual injuries which could have been prevented with timely attention.

## APPLICABLE LAW AND STANDARD OF REVIEW

Summary Judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Tysinger v. Police Department of City of Zanesville, 463 F.3d 569, 572 (6th Cir. 2006); Int'l Union v. Cummins, Inc., 434 F.3d 478, 483 (6th Cir. 2006). When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Tysinger, 463 F.3d at 572; Ciminillo v. Streicher, 434 F.3d 461, 454 (6th Cir. 2006). Direct evidence offered by the Plaintiff in response to a summary judgment motion must be accepted as true. Muhammad v. Close, 379 F.3d 413, 416 (6th Cir. 2004). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue

of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (6th Cir. 1986); <u>Leadbetter v. Gilley</u>, 385 F.3d 683, 689-90 (6th Cir. 2004); <u>Weaver v. Shadoan</u>, 340 F.3d 398, 405 (6th Cir. 2003).  Only disputes over facts that might affect the outcome of the suite under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Hedrick v. W. Reserve Care Sys.</u>, 355 F.3d 444, 451-52 (6th Cir. 2004); <u>Pharakhone v. Nissan N. Am. Inc.</u>, 324 F.3d 405, 407 (6th Cir. 2003).

**<u>SUMMARY OF EVIDENCE</u>**

On or about August 8, 2004, Plaintiff, a 40 year old female, entered a plea of guilty to two counts of uttering and publishing bad checks.  She was sentenced to a minimum of one year and eleven months in prison. On or about September 1, 2004, she was transferred to the MDOC's reception and guidance center. A psychiatric evaluation disclosed a history of depression, treated since 1990 with various medications. On September 7, 2004, Defendant Singhal, a physician's assistant ("P.A."), performed an intake health appraisal of Plaintiff. He noted healed scares on both of her shins, and a history of a hysterectomy.  Plaintiff, however, was found to be in no distress.  (Defendants' Exhibit A, Pages 122, 394-95).

On September 24, 2004, Plaintiff was treated by Defendant Singhal for complaint of a "skin infection" on both legs. She also requested hormone replacement therapy relating to her prior hysterectomy. Singhal again observed that Plaintiff was in no distress, and he ordered blood tests and a biopsy relating to Plaintiff's skin condition.  An October 2, 2004 pathology report diagnosed that condition as "granuloma annulare."  (Defendants' Exhibit A, Page 149).

On October 27, 2004, Grose was transferred to the Wayne Correctional Facility (WCF).  A transfer assessment screening was completed by W. Honor, a registered nurse. She recommended follow-up regarding Plaintiff's pathology report and post-menopausal issues. A receiving screening was also completed at WCF by L. Mosby, R.N. No complaints or evidence of trauma were observed, and Plaintiff was medically cleared for general population.  (Defendants' Exhibit A, Page 124).

On November 11, 2004, Plaintiff was transferred to the SAI Boot Camp Program at the MDOC's Cassidy Lake Camp facility.  (Defendants' Exhibit I).  The SAI program is voluntary, and is modeled after armed forces training. It consists of a structured, authoritative environment including physical activity and training. Candidates who successfully complete the program are eligible for early release from incarceration.

The issues in this case arise from the medical care rendered to Plaintiff while she was in the custody of MDOC.  At all pertinent times, Defendant Correctional Medical Services (hereinafter "CMS") contracted with the State of Michigan to provide health care services to inmates incarcerated by the State.  Defendants Jane Burch, P.A. and Gopal Krishna Singhal, P.A., are independent contractors of CMS.  Singhal was licensed by the State of Michigan as a physician's assistant in 1986, and Burch was similarly licensed in 1998.  (Defendants' Exhibit J).  Singhal was the medical service provider ("MSP") at SCF, and Burch was one of two MSPs at the SAI Cassidy Lake Boot Camp.  The role of each Defendant was to provide on site medical services to inmates incarcerated at their respective facilities.  Defendant Craig Hutchinson, M.D., was employed by CMS as its regional medical director in Michigan. Dr. Hutchinson had no personal contact in any form with Plaintiff.

4

In the early morning hours of November 19, 2004, Plaintiff attempted to descend from her upper bunk at the SAI bunk house to use the restroom. She had been instructed not to jump from the upper level, but rather to step down onto a foot locker, and then to the floor. She had successfully stepped down onto the foot locker, and was standing there for a few seconds prior to stepping down to the floor level. At that point, both of her knees buckled and she fell to the floor, striking both knees. She also struck her forehead on the foot locker, and the back of her head on the bunk bed. (Grose Deposition, Pages 166-67). Plaintiff had utilized the foot locker in descending from her bunk on a number of occasions prior to this incident, without difficulty. She had not injured her legs or knees during her earlier boot camp activities. (Id., Page 176). Plaintiff testified that she immediately experienced pain and swelling in her knees. (Id., Page 179).

Plaintiff got back into the upper bunk, but remained awake. She did not participate in reveille, but spoke to a sergeant at approximately 5:30 a.m. to request medical attention. She can not identify the sergeant. (Grose Deposition, Pages 184-85).

At approximately 11:30 a.m. on November 19, 2004, Plaintiff walked to the SAI medical facility. She was seen by a woman, but can not identify her or state whether she was a doctor, physician's assistant or nurse. Grose explained that she had fallen onto her knees and that she was experiencing severe pain. The woman examined Plaintiff's knees and provided her with Ibuprofen for the pain. Plaintiff was told that she had arthritis and overuse syndrome. The woman further explained that the majority of all trainees suffered from overuse syndrome, and that it was a natural reaction to the extensive exercise and fast pace of the boot camp. (Id., Pages 186-88). Plaintiff was told that, if her pain persisted, she would be put on Prednisone. Grose rejoined her unit, but does not recall whether she

5

participated in the days' activities. She was transferred to a bottom bunk. (Id., Pages 189-91).

SAI medical facility records for November 19, 2004 reflect that Plaintiff was seen by Defendant Burch at 12:00 for complaints that her leg lesions (a preexisting skin rash) were redder than normal, and that it was hard for Plaintiff to bend her knees. Nothing in the medical record reflects that Plaintiff told Burch that she had injured herself in a fall. The progress notes reflect Burch's observations of pitting edema to the knees, blanching erythema over the lesions and crepitus of the right knee. Burch further noted that Plaintiff had full ranges of motion of the knees, without laxity. She assessed Plaintiff with autoimmune skin lesions and overuse syndrome. She ordered Motrin for pain and a bottom bunk detail, and returned Plaintiff to duty. (Defendants' Exhibit A, Pages 5, 157). Burch testified that Ms. Grose provided no history of trauma to her knees, and stated further that, had Plaintiff said she had injured her knee in a fall while descending from her bunk, Defendant Burch would have documented the statement and sent the patient for x-rays. (Burch Deposition, Pages 78-80).

On November 21, 2004, Plaintiff submitted a kite requesting "ice for lumps and cut located on trainees (sic) forehead when trainee fell on 11/19/04." The document makes no mention of injury to Plaintiff's knees. (Plaintiff's Exhibit 21).

Between November 19 and November 28, 2004, Plaintiff participated in boot camp activities on some days, but not others. She was able to opt out on some days by being placed on medical bunk by officers of the facility. On November 21, 2004, Plaintiff refused to double time, claiming that she was unable to do to. (Grose Deposition, Pages 193-95; Plaintiff's Exhibit 5A, Page 1). On November 28, 2004, Plaintiff refused to perform

disciplinary physical training, claiming that she was unable to do scissor kicks.  She was placed on medical bunk.  (Plaintiff's Exhibit 5A, Page 2).

On Monday, November 29, 2004, Plaintiff again presented to Defendant Burch with complaints of pain in her ankles and knees.  Clinical notes reflect Burch's observations of mild blanching edema, full ranges of motion, without laxity, bilaterally in the knees and the ankles, and a "click" in Plaintiff's right knee.  Burch again assessed Grose's condition as overuse syndrome.  She ordered two days of medical bed and continuation of the Motrin.  (Defendants' Exhibit A, Page 157).  Again, the medical notes contain no reference to a fall or other trauma to Plaintiff's knees.  (Id.).

On December 2, 2004, Plaintiff was seen by K. Rupe, R.N. for a complaint of bilateral ankle pain.  Nurse Rupe observed very mild edema, and noted good strength and good ranges of motion.  Pedal pulses were present.  Rupe assessed Plaintiff with alteration in comfort, returned her to medical bunk and ordered ice and Motrin.  (Defendants' Exhibit A, Page 157).

On the following day, Plaintiff was again seen by Defendant Burch off medical bed.  Burch observed that Plaintiff had crepitus in both knees, but noted full ranges of motion and no swelling.  The progress notes, once again, make no mention of a fall or other trauma to Plaintiff's knees, although Burch did observe that Grose was wearing a neoprene brace on her right knee.  Burch again noted her assessment of overuse syndrome, and returned Plaintiff to duty.  (Defendants' Exhibit A, Page 157).

On December 8, 2004, Plaintiff again presented to Defendant Burch, stating that she believed that she had a blood clot on her leg.  Clinical notes reveal that Homans' sign, an indicator of deep vein thrombosis, was negative.  Burch observed a superficial, soft lesion

on the surface of a larger lesion, and assessed skin breakdown and a possible infection. She ordered Keflex and a triple action antibiotic. (Defendants' Exhibit A, Page 159).

On December 10, 2004, Grose was seen by Peter Watson, N.P. (Licensed Nurse Practitioner), with complaints of pain in her legs, knees and feet. Watson observed that Plaintiff exhibited an antalgic gait. He further observed a positive bulge sign of the knees bilaterally, and plaque on both shins, with an open area on the left shin. Watson determined to rule out Sarcoidosis, arthritis and vasculitis, and he ordered x-rays of Plaintiff's knees and a battery of laboratory tests. (Defendants' Exhibit A, Page 159). N.P. Watson testified that he ordered the x-rays and tests because he suspected, (due to the plaque on her shins and the persistent knee pain), that Plaintiff may have had an arthritic condition. (Defendants' Exhibit G, Pages 100-05).

Defendant Burch reviewed Plaintiff's lab results on December 13, 2004, and noted that there was no indication for intervention at that time. She also saw Plaintiff off her medical bed on the same date. She observed that the site of the suspected infection was healing nicely and that the lesions appeared lighter. She assessed a resolving infection of leg lesions and ordered Plaintiff to continue with the Keflex and medical bed status. (Defendants' Exhibit A, Page 159).

The x-rays ordered by N.P. Watson were taken at Duane Waters Hospital (DWH) on December 15, 2004. Dr. Michael A. Henderson, the reviewing radiologist, interpreted them as demonstrating bilateral fractures of the medial plateaus with complete to near complete healing. He saw no evidence of an acute displaced fracture or other acute osseous abnormalities. His impression was "old healed trauma of both medial tibial plateaus." (Defendants' Exhibit A, Page 73). The x-rays were also reviewed by Judith

8

Howze, D.O., the attending physician in the DWS urgent care center on that day. Dr. Howze noted the fractures and ordered that Plaintiff be kept in a non-weight bearing status with a wheelchair only. Dr. Howze completed an urgent authorization request (Form 407) for an in-person appointment for Grose with Dr. Kabindra Mishra, an orthopedic surgeon, on the following morning at DWH. She also ordered that the x-rays be held for review by Dr. Mishra. She instructed Grose to return to DWH on December 16, 2004. (Howze Affidavit, Exhibit A to Defendants' Reply Brief).

Later on December 15, 2006, Dr. Howze asked Dr. Mishra to review Plaintiffs x-rays. Upon doing so, Dr. Mishra noted the bilateral tibial plateau fractures and requested a CT scan. He recommended that Ms. Grose be kept in a non-weight bearing status for four weeks, and that she return to the clinic after that time.[1] Dr. Howze then modified the Form 407 she had prepared to reflect Dr. Mishra's advice. She submitted the form, and the requested treatment was approved that day (December 15, 2004). (Id.). On the same date, Plaintiff was terminated from the SAI Program and transferred to SCF. (Defendant's Exhibit A, Page 402).

On December 16, 2004, Plaintiff was seen at the SCF medical facility by Defendant Gopal K. Singhal, a licensed physician's assistant, who noted that she had been transferred from SAI with fractures of both knees, and that an authorization request for an orthopedic consult at Duane Waters Hospital had already been submitted. (Plaintiff's Exhibit A, Page

---

1. At his deposition on September 25, 2008, Dr. Mishra had no recollection of this incident. He acknowledged, however, that it was not unusual for doctors at DWH to bring x-rays to him for his opinion. He viewed that process as informal academic discussion rather than patient treatment, but he did not dispute Dr. Howze's account. (Mishra Deposition, Exhibit B to Defendant's Reply Brief, Pages 50-51, 69, 79, 82-85).

161).  Singhal ordered Motrin for pain control and noted that Plaintiff was on a non-weight bearing status and wheel chair detail for six to eight weeks.  (Id.).  Singhal had no role in determining the date on which Plaintiff would be seen by an orthopedic specialist.  Under the procedures in place, a Form 407 request was submitted to CMS.  Upon approval, it was sent to DWH, and the hospital administration then set the examination date.  The date set for Grose was January 13, 2005.  Singhal learned of that date from his review of a nursing note on December 27, 2004.  (Singhal Deposition, Pages 55-57).

On January 13, 2005, x-rays of Plaintiff's knees were again obtained.  Dr. Henderson reviewed those studies, and noted his impression of "early healing of bilateral medial tibial plateau fractures."  (Defendants' Exhibit A, Page 76).  Plaintiff was also seen on that date by Dr. Mishra for her orthopedic consultation.  Upon reviewing the new x-rays, Dr. Mishra cancelled the CT scan because he considered it unnecessary.  He entered a diagnosis of bilateral tibial plateau fractures.  (Defendants' Exhibit A, Pages 236-37).  He recommended physical therapy to restore full ranges of motion and that Plaintiff begin walking with a cane with full weight bearing.  He ordered Plaintiff to return to the clinic in four weeks for further x-rays. He opined that Plaintiff would definitely experience degenerative changes in the joints, and that her prognosis remained very guarded, but that no further investigations were needed at that time.  (Id.).

On January 19, 2005, Plaintiff filed a grievance, alleging "wrongful medical diagnosis and inhuman treatment."  (Plaintiffs' Exhibit 10).  On the same day, Defendant Singhal submitted an authorization request to CMS for a follow-up visit by Plaintiff with Dr. Mishra, as well as for physical therapy.  (Defendants' Exhibit B, Tab 2, Page 245).  On January 21, 2005, CMS authorized physical therapy for Plaintiff at Duane Waters Hospital, to begin on

January 28, 2005.  CMS also authorized a follow-up orthopedic consultation with Dr. Mishra which was scheduled for February 24, 2005.  (Defendants' Exhibit B, Tab 2, Page 247).

Plaintiff began physical therapy on January 28, 2005, as scheduled.  (Defendants' Exhibit A, Page 163).  On February 17, 2005, Grose filed a grievance based on "medical neglect."  (Plaintiffs' Exhibit 11).  She was seen by Dr. Mishra at Duane Waters Hospital on February 24, 2005.  Dr. Mishra opined that there was nothing he could offer at that time except to return Plaintiff to physical therapy in an effort to regain her full range of motion.  He recommended that Plaintiff return in six weeks for a follow-up.  (Defendants' Exhibit A, Page 255).  X-rays taken on the same date were reviewed by Dr. David Dubriwny, a radiologist.  Dr. Dubriwny found no evidence of fracture, dislocation or other gross osseous or articular abnormalities.  His impression was "normal bilateral knees." (Defendants' Exhibit A, Page 80).

In accordance with Dr. Mishra's recommendations, Defendant Singhal submitted an authorization request to CMS for a follow-up orthopedic consult.  (Defendants' Exhibit B, Tab 3, Page 257).  On March 2, 2005, CMS authorized a follow-up orthopedic consult for Plaintiff with Dr. Mishra on April 7, 2005.  (Defendants' Exhibit B, Tab 3, Page 259).  On March 10, 2005, Singhal submitted another authorization request for physical therapy. (Defendants' Exhibit B, Tab 4, Page 262).  The request was approved by CMS on March 17, 2005.  (Defendants' Exhibit B, Tab 4, Page 267).

Plaintiff's April 7, 2005 appointment was advanced to April 6, 2005.  (Defendants' Exhibit A, Page 171; Exhibit B, Tab 3, Page 384).  On that date, Dr. Mishra determined that she was unable to return to the boot camp facility because she was still healing.  He recommended another follow-up visit in six weeks.  (Defendants' Exhibit A, Page 272).

11

Due to an administrative lapse, however, an authorization form was not processed immediately. Plaintiff filed a kite on June 1, 2005 regarding that omission.[2] (Plaintiffs' Exhibit 15). On June 3, 2005, Defendant Singhal submitted an authorization request to CMS for a follow-up orthopedic consultation for Plaintiff with Dr. Mishra. (Defendants' Exhibit B, Tab 6, Page 273). The consult was authorized by CMS on June 7, 2005, and the appointment was scheduled for June 16, 2005. (Defendants' Exhibit B, Page 6, Page 274).

New x-rays taken during Plaintiff's June 16, 2005 examination were interpreted by Dr. Dubriwny to reflect a deformity of the medial tibial plateau of the right knee appearing to represent a healing fracture. (Defendants' Exhibit A, Page 86). Dr. Mishra reported that Plaintiff had developed a non-union fracture of both legs. He concluded that the stress fractures were due to excessive exercises at boot camp. He requested authorization for bilateral bone grafts to the medial tibial plateau. (Defendants' Exhibit A, Page 275). On June 16, 2005, Defendant Singhal submitted an urgent authorization request to CMS for the bone grafts. The request was approved on the same date, and surgery by Dr. Mishra was scheduled for June 21, 2005. (Defendants' Exhibit B, Tab 7, Pages 281-82). Plaintiff was admitted to DWH as scheduled and underwent arthrotomy debridement and bone grafting to the right tibial plateau fracture. (Defendants' Exhibit B, Tab 7, Pages 112-13). She was discharged from the hospital on June 24, 2005, with instructions for a follow-up appointment in six weeks. (Defendants' Exhibit A, Page 414).

_____

2. The reviewing authority acknowledged the failure to file the treatment request form, upheld Plaintiff's grievance and apologized to Ms. Grose.

Plaintiff was seen by P.A. Singhal on June 27, 2005.  He noted that she was "doing fine."  He recorded that Plaintiff denied discomfort, but that she claimed to have fallen. Singhal assessed Ms. Grose as "status post bone graft right knee" and he entered orders for daily dressing changes, meals in the housing unit and limitations on Plaintiff's ambulation.  No post operative report appeared in the chart, and Singhal did not submit a Form 407.  In response to a subsequent grievance by Plaintiff, Nurse Honor noted that a two page discharge summary from the surgical unit had been misfiled.  The next day, August 17, 2005, Singhal completed a Form 407 as called for in the June 24, 2005 discharge instructions. The request was approved on August 22, 2005, with the appointment scheduled for September 8, 2005.  (Defendants' Exhibit B, Tab 8, Page 283). Following his examination of the Plaintiff on that date, Dr. Mishra noted that Grose was doing well.  She was instructed to keep exercising and to return in two months for follow-up treatment.   Dr. Mishra opined that Plaintiff's recovery had been "fairly satisfactory." (Defendants' Exhibit B, Tab 8, Page 286, 288).

On September 9, 2004, Defendant Singhal submitted an authorization request for the follow-up appointment.  The request was approved on September 19, 2005, and the examination was scheduled for November 10, 2005.  (Defendants' Exhibit B, Tab 9, Pages 289-90).  Plaintiff was seen by Dr. Mishra as scheduled.  The surgeon's consultation note following that examination reflects that Plaintiff had improved and was walking better, although she still experienced pain in the right knee where the bone grafting procedure had been performed.  X-rays revealed that the plateau fracture was healing extremely slowly, with some evidence of avascular necrosis, which had existed prior to the bone graft.  Dr. Mishra reported that Plaintiff's symptoms were not excessive, and that the left side

13

appeared to be healed.  He recommended that Grose continue using a cane, exercise as much as possible, and return in three months for bilateral x-rays of her knees. (Defendants' Exhibit B, Tab 9, Page 291).  A special accommodation notice was issued for Plaintiff to receive a cane and a knee brace.  (Defendants' Exhibit A, Page 348).  An authorization request was submitted for a three month follow-up appointment with Dr. Mishra.  The request was approved on November 18, 2005, and the appointment was scheduled for February 9, 2006.  (Defendants' Exhibit B, Tab 10, Page 297).  The appointment was subsequently rescheduled for March 30, 2006.  (Defendants' Exhibit B, Tab 10, Page 408).  On that date, Plaintiff was seen by Dr. Nimr Ikram, who administered a cortisone injection, issued prescriptions for Ultram and Naprosyn, and recommended follow-up visits as needed.  (Defendants' Exhibit A, Page 298).  On May 2, 2006, Plaintiff was released from MDOC custody on parole.

Subsequent to her release on parole, Plaintiff continued to experience pain and dysfunction in her knees.  She has undergone five separate surgeries, including bilateral joint replacements.  She has developed arthritis in both legs and continues to be limited in her daily activities.  More surgeries may be needed, and her treating doctors have opined that she is disabled from any work she has performed in the past.  She has been awarded Social Security Disability Benefits.  There is evidence that, if Plaintiff had been treated for her fractures soon after they occurred, her prospects for earlier and more complete recovery would have been improved.

There is a divergence of opinion as to whether a diagnosis of overuse syndrome calls for x-rays, at least in those cases in which no significant swelling is observed and

14

there is no report of significant blunt trauma.  Dr. Mishra opines that x-rays are indicated (D.E. No. 127-4), while Dr. Drouillard believes that they are not (D.E. No. 127-7).

Several of the medical professionals involved in this case hold the view that Plaintiff's bilateral tibial plateau fractures are unlikely to have resulted from a fall from her footlocker while descending from an upper bunk.  That opinion was expressed by Dr. Mishra (D.E. No. 127-4, Pages 58-59); Dr. Howze (D.E. No. 127-3, Pages 3-4); and Nurse Practitioner Watson (D.E. No. 127-5, Pages 4-5), each of whom treated Ms. Grose.  Similar opinions were rendered by Dr. Paul J. Drouillard (D.E. No. 127-7), an orthopedic surgeon retained by the movants and Dr. Sidney N. Martin (D.E. No. 127-6), a consulting orthopedic surgeon chosen by Plaintiff.

## **ANALYSIS**

The Eighth Amendment bans cruel and unusual punishment which involves the unnecessary and wanton infliction of pain.  Hudson v. McMillan, 503 U.S. 1, 5 (1992); Pelfrey v. Chambers, 43  F.3d 1034, 1037 (6th Cir. 1995).  It is well established that deliberate indifference to serious medical needs constitutes the unnecessary and wanton infliction of pain.  Estelle v. Gamble, 429 U.S. 97, 104-105 (1976).  To sustain an Eighth Amendment claim of deliberate indifference to medical needs, a prisoner must satisfy a two pronged test.  First, she must demonstrate that the medical needs were serious and required attention that adhered to "contemporary standards of decency." Hudson, 503 U.S. at 8.  Then, she must establish that defendants were deliberately indifferent to those needs. Id.

Deliberate indifference exists when "the official knows  of and disregards an excessive risk to inmate health and safety; the official must be aware of facts from which

15

the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). In other words, this prong is satisfied when a prison official acts with criminal recklessness, i.e. when he or she "consciously disregard(s) a substantial risk of serious harm." Brooks v. Celeste, 39 F.3d 125, 128 (6th Cir. 1994)(citing Farmer, 114 U.S. at 839-840).

Mere negligent inattention to a prisoner's request for assistance does not offend substantive due process under the Fourteenth Amendment, Davidson v. Cannon, 474 U.S. 344 (1986), and medical malpractice does not become a constitutional violation merely because the victim is a prisoner. Estelle, 429 U.S. at p. 106. Basically, there must be a knowing failure or refusal to provide urgently needed medical care which causes a residual injury that could have been prevented with timely attention. The court must consider the wide discretion allowed prison officials in their treatment of prisoners under authorized medical procedures. Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976).

**PLAINTIFF'S CLAIM AGAINST DEFENDANT BURCH**

For the most part, the evidence regarding Defendant Burch's treatment of Plaintiff is uncontested. Generally, such a circumstance indicates that summary judgment is appropriate. For purposes of this motion, the court must view the evidence in the light most favorable to the Plaintiff.

The only direct conflict in the evidence arises from Plaintiff's testimony that she told Defendant Burch that she had injured herself in a fall, and Burch's testimony that she did not. I will assume for purposes of this Report that Ms. Grose did inform Burch that she had injured her knees in a fall while descending from her upper bunk. The record reflects that Defendant Burch neither recorded nor acted upon that information. Even so, she did note

16

Plaintiff's subjective complaint of "hard to bend" knees, examine Grose's legs, record her objective clinical observations, and render a diagnosis of "overuse syndrome," all based upon the similarity of Grose's fairly benign objective signs and symptoms to those of many other boot camp inmates whom she had previously treated. Burch explained to Plaintiff that the majority of all trainees suffered from overuse syndrome, and that it was a natural reaction to the extensive exercise and fast pace of the boot camp. She provided Plaintiff with Ibuprofen for her pain, and told her that, if it persisted, she would be put on Prednisone. Plaintiff was returned to duty, and assigned to a lower bunk in order to further ameliorate her symptoms.

Defendant Burch conceded in her deposition testimony that a history of trauma would have warranted a more aggressive investigation, including x-rays. She testified that, had she known Plaintiff was injured in a fall, she would have adopted that course. Nothing in the record explains Burch's failure to apprehend Plaintiff's description of her fall, or to affirmatively obtain, record and consider that medical history in assessing to Plaintiff's knee pain. A reasonable jury could find that such a failure is not consistent with prudent medical practice. Nonetheless, it is clear that Burch was not indifferent to Grose's complaints. Rather, she performed a clinical examination and employed her medical education and experience in formulating a diagnosis and initiating a course of treatment. Sadly, the diagnosis was not accurate, and the course of treatment was inadequate to address Plaintiff's actual medical condition.

Plaintiff's MDOC medical record reflects that she was next seen by Defendant Burch on November 29, 2004 for pain in her ankles and knees. Burch again performed a clinical examination and found mild blanching edema bilaterally, full ranges of motion, without

laxity, in both knees and ankles, despite a "click" in the right knee. Burch maintained her diagnosis of overuse syndrome and ordered Plaintiff to two days of medical bed, in addition to continuing with the pain medication.

Three days later, Ms. Grose was seen by Nurse Rupe for complaint of bilateral ankle pain. His examination revealed very mild edema, good strength and good ranges of motion. Pedal pulses were present. Rupe ordered continuation of Plaintiff's medical bunk, together with ice and Motrin.

On December 3, 2004, Plaintiff was seen by Defendant Burch off medical bed. Examination revealed bilateral crepitus of the knees, without swelling. Plaintiff enjoyed full ranges of motion. She was noted to be wearing a neoprene brace on her right knee. Burch maintained her assessment of overuse syndrome and returned Plaintiff to duty. That was the last time Defendant Burch treated Ms. Grose for knee complaints.

On December 8, 2004, in response to a kite in which Plaintiff complained of a possible blood clot on her leg, she was see by Burch. Clinical examination revealed a superficial soft lesion on the surface of a larger lesion. Homans sign was negative. Burch assessed a skin breakdown, possibly due to infection, and provided Keflex-Triple antibiotic. Five days later, Burch examined Plaintiff off medical bed to follow up on the skin condition. She observed that the infected spot was healing nicely, and the lesions appeared lighter. Burch entered an assessment of resolving infection and continued Plaintiff on Keflex and medical bed. On the same date, she performed a chart review regarding the results of lab tests ordered by Nurse Watson on December 10, 2004. Those results were unremarkable.

Viewed in the light most favorable to Plaintiff, the evidence in the record supports the conclusion that she was suffering from bilateral tibial plateau fractures when she was

examined by Defendant Burch on November 19, 2004.  That condition is very rare.  Burch had never treated a similar injury.  Plaintiff walked to the medical clinic to be treated.  She complained of "hard to bend" knees and described the fall from her footlocker while descending from her bunk during the previous night.  Burch failed to record or consider the information relating to the fall.  She performed an examination of Plaintiff's knees, noted mild objective symptoms consistent with the majority of SAI trainee patients early in their training, concluded that Grose's discomfort was caused by overuse syndrome, explained her conclusion to Grose, prescribed pain medications consistent with her diagnosis, predicted that Plaintiff's pain would resolve, and told her that, if it did not, stronger measures would be taken.

Burch's subsequent professional contacts with Plaintiff follow the same pattern.  Grose's complaints of knee and ankle pain, on November 29, 2004, were addressed by a clinical examination which revealed mild edema with full ranges of motion, bilaterally, without laxity.[3]  Burch did note a "click" in Plaintiff's right knee.  Consistent with her clinical experience that overuse syndrome could take weeks to resolve, she maintained  her original diagnosis, but ordered two days of medical bed in addition to pain medication.

Burch's examination of Plaintiff on December 3, 2004 revealed crepitus in both knees, but no swelling and full ranges of motion.  Again, her objective findings were consistent with her experience in overuse syndrome cases.

---

[3]  Nurse Rupe's examination of Grose in response to her complaint of ankle pain (not knee pain) on December 2, 2004 revealed only very mild edema, with good strength and ranges of motion.

Plaintiff's December 8, 2004 appointment with Burch was unrelated to her knee complaints. Plaintiff sought treatment for what she believed was a blood clot on her leg. Burch's examination and testing centered on that complaint, and she undertook appropriate treatment. She reviewed the lab results in a timely manner, and her follow-up exam on December 13, 2004 confirmed that the lesion was healing.

It is incumbent upon one asserting a deliberate indifference claim to prove that the decision to provide substandard medical care was deliberate or knowing. Scicluna v. Wells, 345 F.3d 441, 446 (6th Cir. 1998). While Plaintiff need not prove that Burch had the "express intent to inflict unnecessary pain," she must prove that Defendant's conduct demonstrated a level of "obduracy and wantonness" greater than simple "inadvertence or error in good faith. . . ." Id. at 445 (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health and safety; the official must be aware of facts from which an inference could be drawn that a substantial risk of harm exists . . .." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Accepting Plaintiff's assertion that she told Burch that she had injured herself in a fall, a reasonable jury could conclude that Burch was aware of sufficient facts to support an inference of substantial risk. It is also essential to Plaintiff's case, however, that she prove that Burch actually drew the necessary inference. Otherwise, she cannot establish the requisite conscious disregard essential to a finding of deliberate indifference. Farmer, supra; Brooks v. Celeste, 39 F.3d 125, 128 (6th cir. 1994). The failure of P.A. Burch to obtain and act upon the stated facts relating to Plaintiff's fall could support a finding of negligence. I see nothing in this record, however, to support the inference that the

Defendant did actually and subjectively apprehend that history, or that she was doing otherwise than attempting to accurately assess Plaintiff's condition and provide appropriate relief. Plaintiff offers no evidence that Burch in any way acknowledged her account of a fall. No mention of a fall or other specific trauma is contained in Burch's treatment notes. There is no evidence that Burch understood, or even suspected, the true nature of Plaintiff's knee complaints. Evidence that Burch should have heard Plaintiff's account of a fall is not sufficient to establish an Eighth Amendment violation. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner, <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976), and Burch's Motion for Summary Judgment should be granted.

### <u>PLAINTIFF'S CLAIM AGAINST DEFENDANT SINGHAL</u>

The evidence regarding Defendant Singhal's involvement in Plaintiff's treatment is also substantially uncontested. Plaintiff faults Singhal's conduct in three primary respects. First, she claims that he failed to arrange an appointment for Plaintiff to be seen by an orthopedic surgeon following his visit with her on December 16, 2004. Second, Plaintiff asserts that Singhal's failure to act upon an orthopedic nurse's note during his April 8, 2005 visit with Plaintiff resulted in several weeks delay in her postoperative follow-up examination by Dr. Mishra. Third, Plaintiff complains that Singhal's failure to note the absence of a postoperative report in Plaintiff's file during her June 27, 2005 visit with him again resulted in the delay of a follow-up appointment with Dr. Mishra.

Defendant Singhal was employed by CMS as a physician's assistant at the SCF Medical Facility. He saw Plaintiff in that capacity on December 16, 2004. Plaintiff alleges (and I accept for purposes of this report) that Singhal informed her that he would make an

appointment the following day for her to see an orthopedic specialist for her bilateral knee fractures. It is undisputed that Singhal did not submit a Form 407 to arrange the appointment.  It is also undisputed, however, that a Form 407 was prepared. That fact is noted in Singhal's December 16, 2004 treatment note.  The Form 407 was completed by Dr. Judith Howze on December 15, 2004.  Her Affidavit reflects that she completed the form as a request for an urgent, in person appointment for Plaintiff to see Dr. Mishra at the Duane Waters Hospital on December 16, 2004.  After completing the form, however, Dr. Howze asked Dr. Mishra to review Plaintiff's x-rays.  Upon doing so, Dr. Mishra noted bilateral medial tibial plateau fractures, requested a CT scan, and recommended that Plaintiff be kept in a non-weight bearing status for four weeks, after which she should return to the clinic.  Dr. Howze then modified the Form 407 to reflect Dr. Mishra's advice.  She submitted the form, and the follow-up visit was approved on the same day.  Paragraph 13 of her Affidavit states as follows:

> When I signed off on Grose, after I completed my treatment of her, I did not expect her to come back to the clinic on December 16, 2004, because Dr. Mishra already reviewed the x-rays, recommended that she be kept in a non-weight bearing status for four weeks, and that she should return to the clinic in four weeks.

(Howze Affidavit - Exhibit A to Defendant's Reply Brief).

As Plaintiff's bilateral fractures had been addressed by two medical providers of higher rank, including an orthopedic surgeon, and arrangements had been made for an orthopedic consult, it is not surprising that Defendant Singhal took no further action to secure an appointment.  The scheduling of any appointment would, in no event, be within his control.  I am satisfied that no reasonable finder of fact could conclude that Singhal's conduct on December 16, 2004 demonstrated deliberate indifference to Plaintiff's serious

medical needs.  It is worthy of note that Plaintiff has made no claim against Dr. Howze or Dr. Mishra, whose actions actually led to the delay in her orthopedic consultation.

Plaintiff next complains that Defendant Singhal failed to take appropriate action to arrange further treatment following a clinic visit with her on April 8, 2005.  Two days earlier, Plaintiff had been examined by Dr. Mishra, who ordered that she return to his office in six weeks with updated x-rays.  A clinical note to that effect was placed in Plaintiff's treatment record by an orthopedic nurse on April 6, 2005.

Defendant Singhal saw Plaintiff on April 8, 2005.  His treatment note reflects that Plaintiff was requesting Estrogen, pain pills and a tennis shoes detail.  The note reveals that, on examination, Plaintiff's general condition was fair.  She complained of pain in her hips, knees and legs.  Singhal noted that Plaintiff was status post bilateral plateau fracture, and that she was being followed for those injuries by Dr. Mishra.  Singhal prescribed Premarin and Indocin.  Plaintiff correctly asserts, however, that he made no reference in his note to the orthopedic nurse's April 6th entry directing that Grose was return to Dr. Mishra in six weeks with new x-rays.  Singhal did not file a Form 407 to request the follow-up appointment for Plaintiff with Dr. Mishra.

I am satisfied that a reasonable fact finder could conclude that Defendant Singhal's failure to submit a Form 407 to implement the treatment called for in the orthopedic nurse's note of April 6, 2005 constituted a breach of his duty.  Mere negligence, however, is not a constitutional violation.  Plaintiff must establish deliberate indifference on Singhal's part in order to succeed on an Eighth Amendment claim.  While she need not prove that Singhal had the "express intent to inflict unnecessary pain," she must prove that Defendant's conduct demonstrated a level of "obduracy and wantonness" greater than simple

23

"inadvertence or error in good faith . . .." <u>Scicluna v. Wells</u>, 345 F.3d 441, 445 (6th Cir. 1998) (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986)).  Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health and safety; the official must be aware of facts from which an inference could be drawn that a substantial risk of harm exists . . .." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  In this case, Singhal's clinical note of April 8, 2005 makes no reference to the April 6, 2005 nurse's note containing the "RTC (return to clinic) in six weeks . . ." instruction.  Unquestionably, Singhal should have observed the nurse's entry.  There is no evidence, however, that he actually did so.  Nor is there evidence that Singhal actually drew the inference that inaction on his part posed a substantial risk to Plaintiff's health.

There is evidence in the record to suggest that Singhal was not deliberately indifferent to Plaintiff's distress.  Grose sought his treatment on April 8, 2005 for a post-menopausal condition and for pain in her lower extremities (hips, knees and ankles).  Singhal conducted a clinical examination and issued orders for both Premarin (an estrogen medication) and Indocin (a pain medication).  His actions were consistent with an effort to relieve her distress, and they are inconsistent with an inference of indifference to her condition.  Plaintiff maintains (and I accept) that she submitted a health care request on May 27, 2005,[4] reflecting that she was two weeks overdue for her follow-up with Dr. Mishra. The Department of Corrections responded, on June 1, 2005 that no follow-up appointment had been made.  Shortly thereafter, on June 3, 2005, Defendant Singhal submitted the required Form 407.  Dr. Mishra examined Plaintiff on June 16, 2005, and determined that

---

[4]   May 27, 2005 was the Friday preceding the three day Memorial Day weekend.

bone graft surgery was indicated. Defendant Singhal submitted the necessary Form 407 for that surgery on the same date, and the surgery itself was performed on June 22, 2005. His actions in furthering Plaintiff's care are inconsistent with deliberate indifference.

On June 24, 2005, an orthopedic nurse recorded a post-operative progress note containing orders for Plaintiff's care following her discharge from the hospital. Included in the entry was a directive that Plaintiff return to the hospital clinic in six weeks. (Document No. 140-4, Page 21). Following her return to SCF, Plaintiff was seen by Defendant Singhal on June 27, 2005. His note reflects that she had returned from the hospital status-post bone graft of the right knee. Plaintiff informed Singhal that she was doing fine. She denied any discomfort, but indicated that she had fallen on June 25, 2005 (Saturday). In the treatment plan section of his note, Singhal wrote "see order." (Document No. 140-4, Page 22). Defendant's note does not otherwise reference the post surgical treatment order, and there is no indication that a Form 407 was filed for Plaintiff's return to the hospital in six weeks. Following the appointment with Singhal, Plaintiff experienced difficulty in securing medication refills. On August 1, 2005, she addressed that issue in a grievance numbered SCF05080095212 (Document No. 140-6, Page 13). On August 16, 2005, she discussed the grievance regarding her medications with Nurse W. Honor. Following that discussion, Plaintiff raised for the first time the issue of her follow-up appointment with Dr. Mishra, which was then eleven days overdue.[5] (D. E. 140-4, Page 23). Honor checked Plaintiff's medical record for information concerning her return appointment, and none was found. Plaintiff was asked to provide her copy of the discharge instructions. Upon receipt of that

---

[5]    The appointment was not mentioned in the grievance form.

copy, Nurse Honor checked with Ms. Bryant, who had no knowledge of an order for Plaintiff's return to Duane Waters Hospital.  Subsequent investigation revealed that the return to clinic order had been misfiled.  The order was provided to Ms. Bryant for follow-up, and Honor explained the circumstances to Plaintiff.  On the following day, a Form 407 was generated for Plaintiff's follow-up visit to the orthopedic section at Duane Waters Hospital.

Plaintiff alleges that Defendant Singhal's failure to note the absence of a post-operative report in her file during his visit on June 27, 2005 constituted deliberate indifference to her serious medical needs, and thus violated her Eighth Amendment rights. I disagree.  The orthopedic nurse's note was written on Friday, June 24, 2005.  Singhal saw Plaintiff in the prison clinic the following Monday.  There is no evidence that the nurse's note was actually in Plaintiff's records (misfiled or otherwise) during the Monday visit.  It is clear from his treatment note that Singhal fully expected an order to be forthcoming.  His entry reflects his treatment plan that such an order be followed.  It is not unreasonable, however, that it might take more than one full business day for proper filing to be completed.  Singhal's next entry in Plaintiff's medical record was made on August 3, 2005, on which day medications were ordered.  While a reasonable fact finder might conclude that it was neglectful, or even negligent, on Singhal's part to overlook the absence of the post operative nursing note on that date, I find no basis in the record for a finding of deliberate indifference to Plaintiff's serious medical needs.  There is no evidence that Singhal was actually cognizant of the return to clinic order prior to the conclusion of Nurse Honor's investigative efforts, on June 16, 2005.  Plaintiff's records reflect that Singhal submitted the Form 407 on the very next day to arrange for Plaintiff's return to the orthopedic surgeon.  (D.E. 140-4, Pages 23-24).  While the CMS record keeping system

may be deserving of criticism, there is no evidence that Defendant Singhal was responsible for the misfiling of Plaintiff's treatment order.  When the administrative lapse was finally rectified, he took prompt action to provide Plaintiff with the necessary medical care.

The subjective component of deliberate indifference requires a Plaintiff to demonstrate that an official who actually knew of a serious medical need possessed a sufficiently culpable state of mind.  "Deliberate indifference describes a state of mind more blameworthy than negligence."  Perez v. Oakland County, 466 F.3d 416, 435.  "Deliberate indifference" is more than mere negligence, although less than actual intent to do harm.  Gibson v. Foltz, 963 F.2d 851, 853 (6th Cir. 1992).  Even gross negligence by a prison official is insufficient to establish deliberate indifference.  McGhee v. Foltz, 852 F.2d 876, 881 (6th Cir. 1988).  Rather, the official's subjective state of mind must manifest "deliberateness tantamount to an intent to punish."  Horn v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir. 1994).  Knowledge of a serious medical need is essential to a finding of deliberate indifference.  The Supreme Court has explained that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for condemnation, cannot . . . be condemned as the infliction of punishment."  Farmer v. Brennan, 511 U.S. 825, 838 (1994).  There is simply no evidence to support the proposition that Singhal's failure to submit a Form 407 prior to August 17, 2005 was a knowing and obdurate failure to provide necessary treatment to Grose.

As stated above, the record contains evidence which, evaluated in a light most favorable to Plaintiff, would call the medical judgments and actions of physicians' assistants Burch and Singhal into serious question.  Affording Plaintiff the benefit of every favorable

27

inference, however, I find nothing to justify the conclusion that Burch or Singhal actually knew of her serious medical needs and obdurately failed to meet them.

**PLAINTIFF'S CLAIM AGAINST CRAIG HUTCHINSON, M.D.**

Dr. Craig Hutchinson served as Regional Medical Director of CMS during the events giving rise to Plaintiff's Complaint. At no time, however, did Defendant Hutchinson ever examine Ms. Grose, provide her with medical treatment, or otherwise undertake a personal involvement in her care and treatment. Rather, the Amended Complaint, after setting out in great detail Hutchinson's various responsibilities as a management level employee of CMS, charges that he failed to supervise and train Burch and Singhal, and failed as well to perform chart audits or otherwise review the medical services provided by them to the Plaintiff. (Third Amended Complaint, Paragraphs 9, 53-97, 124-130).

Liability under 42 U.S.C. §1983 must be based upon more than the right to control employees. Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999). Plaintiff cites City of Canton v. Harris, 489 U.S. 378 (1989), for the proposition that the failure to train can amount to deliberate indifference when the need for more or different training is obvious. Even if the legal point is conceded, however, the evidence in this record simply doesn't make the requisite showing of obviousness. Both Defendants Burch and Singhal were at all relevant times properly licensed to perform the duties of physician's assistants in Michigan. There is no evidence that injuries similar to those experienced by Grose in this case were overlooked or ignored in other cases within the MDOC medical system, let alone that Hutchinson knew of such cases. Our circuit has held that liability under Section 1983 must be based upon active unconstitutional behavior, and cannot be based upon "a mere failure to act." Shehee v. Luttrell, 199 F.3d at 300; Salehpor v. University of Tennessee,

159 F.3d 199, 206 (6th Cir. 1998).  A supervisory official may be held liable only if it is shown that he encouraged a specific incident of misconduct or directly participated in it. Id.; see also, Bellamy v. Bradly, 729 F.2nd 416, 421 (6th Cir. 1984).  Plaintiff in this case has neither demonstrated that Hutchinson took action with respect to her, or that he facilitated, encouraged or condoned a specific act of deliberate indifference with respect to her.  Even the Boyd case cited by Plaintiff recognized the limited liability of supervisors in the Section 1983 context.

> [A] Supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference.  'The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see.'

Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995) (internal citations omitted).

I have concluded, as stated earlier in this Report, that neither Defendant Burch nor Defendant Singhal engaged in any act of deliberate indifference to Plaintiff's serious medical needs.  Should the court adopt that view, there was no violation of Plaintiff's Eighth Amendment right for Dr. Hutchinson to have engaged in or encouraged.  Even if the court should reject my conclusions, and find that Burch and Singhal were deliberately indifferent to Plaintiff's serious medical need, there is neither an allegation nor evidence that Hutchinson was aware of such violations, or encouraged or participated in them.  In fact, there is no evidence that Hutchinson was aware of any form of unconstitutional conduct directed to this Plaintiff or any other SAI inmate.  Even if he had knowledge of such unconstitutional conduct, it would be insufficient, standing alone, to impose liability upon him under §1983.  Poe v. Haydon, 853 F.2d 418, 429 (6th Cir. 1988).  As Plaintiff has failed to cite any affirmative evidence suggesting that Dr. Hutchinson engaged in, or encouraged,

any particular incident of deliberate indifference to Plaintiff's medical needs, or even that

he was aware of such an incident, he is entitled to judgment as a matter of law.

## PLAINTIFF'S CLAIM AGAINST CORRECTIONAL MEDICAL SERVICES

Defendant CMS seeks summary judgment in its favor on the theory that Plaintiff has

failed to show that it maintained an unconstitutional policy, practice or procedure that was

the proximate cause of any injury to her.  In Monell v. Dep't. of Social Services of New York

City, 436 U.S. 658, 691 (1978), the Supreme Court held that Section 1983 liability may not

be imposed upon a municipal corporation solely on a theory of *respondeat superior*.

"Instead it is when execution of a government's policy . . . inflicts the injury that the

government as an entity is responsible under Section 1983." Id. at 694.  It is unnecessary

that the offending custom or practice be formally adopted and promulgated.  "An act

performed pursuant to a 'custom' that has not been formally approved by an appropriate

decision maker may fairly subject a municipality to liability on the theory that the relevant

practice is so widespread as to have the force of law."  Board of County Commissioners

v. Brown, 520 U.S. 397, 404 (1997).

> The critical issue is whether there was a particular custom or practice that
> was 'so well settled and widespread that the policy making officials of the
> municipality can be said to have either actual or constructive knowledge of
> it yet did nothing to end the practice.'

Schwartz and Urbonya, Section 1983 Litigation (2nd Edition) (citing Bordanaro v. McLeod,

871 F.2d 1151, 1156 (1st Cir. 1989)).  The parties in the case at bar agree that the Monell

doctrine applies with equal force to private corporations acting under color of state law.

Street v. Corrections Corporation of America, 102 F.3d 810, 817-18 (6th Cir. 1996); Sanders

v. Sears, Roebuck and Co., 984 F.2d 972, 976 (8th Cir. 1993).

Plaintiff offers three arguments in support of her position that CMS had a custom, policy or procedure of providing inadequate medical care to Michigan prisoners.  First, she asserts that CMS did not provide medical training to its P.A.'s at the boot camp.  Second, she maintains that Defendant made no provision for its physicians to supervise the P.A.'s assigned to the SAI boot camp for women in 2004 or 2005.  Finally, Plaintiff claims that CMS did not have a full-time mid-level medical position assigned to the boot camp, and that it "borrowed staff who were willing to work extra hours or arranged through Defendant Hutchinson, with the approval of MDOC, to have staff assigned to the boot camp from adjacent facilities."  Grose maintains that these circumstances warrant a finding of deliberate indifference on the part of CMS to her serious medical needs.

CMS responds that Plaintiff has failed to produce any affirmative evidence that it maintains unconstitutional policies, practices or procedures.  Defendant contends that Plaintiff's arguments are unsupported by the record.  I agree.

While it is true that CMS did not provide medical training at the SAI facility, it staffed the clinic with licensed medical practitioners.  P.A. Burch was at all times a duly licensed and board certified physician's assistant.[6]  She testified that CMS provided annual training and meetings for physician's assistants.[7]  As is true of all physician's assistants in Michigan, Burch was required to successfully pass a certification examination every six years. (Burch Deposition, Pages 7-12). The situation with respect to physician supervision of P.A.'s is similar.  Burch split her work days between the SAI boot camp and the Huron

---

[6]  The same is true of P.A. Singhal.

[7]  She also received a five day training program when she first began at SAI, but it was focused on work in a correctional setting rather than medical practice.

31

Valley Correctional Facility, generally serving two days per week at one facility and three days at the other. She also filled in occasionally at the Scott Correctional Facility. Initially, she was supervised at Huron Valley by Dr. Piper, and at Scott by Dr. Sawhney. Later, she was supervised by Dr. Thai at Huron Valley. Burch testified that her official supervisor at SAI was Dr. Hutchinson. He was not personally present during Burch's shifts there. She generally referred any questions to Dr. Thai, but she testified that Dr. Hutchinson was also available by telephone to answer questions and provide guidance. (Burch Deposition, Pages 7-12; 52-54). Dr. Hutchinson testified that, because the SAI boot camp was staffed on a part-time basis by physician's assistants who had worked in other MDOC facilities, there was no specific supervising physician assigned to SAI, and the P.A.'s received supervision from physicians at their primary places of work. (Hutchinson Deposition, Pages 32-36). Nonetheless, as Burch testified, the P.A.'s at SAI did have access to physician guidance.

The Supreme Court in <u>Canton</u> determined that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis of liability under Section 1983." <u>Id</u>. at 387. Liability may be imposed upon an employer corporation only where the deficiency in training amounts to deliberate indifference to the rights of persons with whom its employees come into contact, <u>and</u> where the deliberate indifference was the moving force which brought about a violation of the plaintiff's federally protected rights.

> The plaintiff must demonstrate *specific* training deficiencies and either (1) a pattern of constitutional violations of which policy making officials can be charged with knowledge, *or* (2) that training is obviously necessary to avoid constitutional violations . . .. The plaintiff must show that 'the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights' as to amount to a [ ] policy of deliberate indifference to citizens' constitutional rights. The Court in <u>Canton</u> held that

32

negligent or even grossly negligent training does not by itself give rise to a §1983 [ ] liability claim.  The plaintiff must also demonstrate a sufficiently close causal connection between the deliberately indifferent training and the deprivation of plaintiff's federally protected right.

Schwartz and Urbonya, Section 1983 Litigation (2nd Edition), pp. 112-113.

In the case at bar, Defendant CMS hired licensed, board certified physician's assistants to render first level medical services to the SAI boot camp inmates.  P.A. Burch testified that she received training on an annual basis, and that she received personal supervision and guidance from CMS physicians at her primary work place.  Although Dr. Hutchinson was not personally present at SAI to supervise and/or guide her in the rendering of medical services to boot camp inmates, he was available to her by telephone to answer questions and provide guidance.  Plaintiff has pointed to nothing in the record which rebuts Burch's or Hutchinson's testimony.  She has not pointed to evidence of specific deficiencies establishing (1) a pattern of violation of patients' constitutional rights at SAI of which CMS can be charged with knowledge; or (2) that the need for more or different training was so obvious, and the inadequacy so likely to result in constitutional violations of patients' rights at SAI, that CMS should be deemed to have been cognizant of it.  Accordingly, I find that the record will not support Plaintiff's assertion that the physician's assistants serving at SAI received constitutionally inadequate training or supervision.

I accept (as I must) Plaintiff's assertion that she informed Burch that she had suffered a fall resulting in her bilateral knee pain.  Burch denied in sworn testimony that she was so advised, and there is nothing in her clinical notes concerning a fall.  It may well be that both witnesses are telling the truth, and that Burch simply failed to hear or understand

33

Plaintiff's account.   In any event, Burch testified that a history of a fall would have warranted sending Grose for x-rays.   It is thus clear that Burch had sufficient medical expertise to deal with the situation correctly.   Whether the court attributes her failure to obtain x-rays to negligence, or something worse, it is apparent that the failure to act was not the result of inadequate medical training.

The same may be said of P.A. Singhal.   The record amply demonstrates his understanding of the procedural requirement that a Form 407 be submitted for approval of necessary medical services.   He submitted timely forms on Plaintiff's behalf on numerous occasions.   Whatever may be the cause of his delay in submitting forms on the particular occasions described in the Complaint, he was clearly aware of the required administrative process, and thus adequately trained in it.   Plaintiff has pointed to no evidence that such delays were a custom or practice so well settled and widespread at SAI that policy making officials of CMS can be said to have had actual or constructive knowledge of them.   As Justice White wrote in Canton, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [employer] liable."   489 U.S. at 391.

Even if this court were to find that the training received by Burch and Singhal was in some specific respect deficient, Plaintiff must still demonstrate that the specific deficiency in training actually caused a violation of her constitutional right to medical care.   Canton, 489 U.S. at 391 ("[R]espondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs.").   Plaintiff here points to no such evidence.   She merely asserts (incorrectly) that no training occurred, and concludes that that   inadequacy resulted in Burch's (and Singhal's) deliberate indifference to her

34

serious medical condition.   Such a presumptive presentation is simply inadequate to

support a verdict.  Plaintiff must establish a causal connection, and the Supreme Court in

<u>Canton</u> explained why.

> To adopt lesser standards of fault <u>and</u> causation would open municipalities
> to unprecedented liability under §1983.  In virtually every instance where a
> person has had his or her constitutional rights violated by a city employee,
> a §1983 plaintiff will be able to point to something the city "could have done"
> to prevent the unfortunate incident.  Thus, permitting cases against cities for
> their "failure to train" employees to go forward under §1983 on a lesser
> standard of fault would result in *de facto respondeat superior* liability on
> municipalities - a result we rejected in <u>Monell</u>.  It would also engage the
> federal courts in an endless exercise of second guessing municipal employee
> - training programs.  This is an exercise we believe the federal courts are ill
> suited to undertake, as well as one that would implicate serious questions of
> federalism.

<u>Canton</u>, 489 U.S. at 392-93 (emphasis added).

Having considered the evidence in the record in light of the arguments of the parties,

I am left with the firm conclusion that this is a medical malpractice case couched in

constitutional terminology.  I am satisfied that a reasonable fact finder could determine that

the conduct of Burch and Singhal was negligent, and that Plaintiff suffered harm as a result

of delays in the treatment of her bilateral tibial plateau fractures.  While the evidence could

support a finding that the medical judgments of Defendant Burch and the administrative

lapses by Defendant Singhal (not to mention an apparent mis-communication between Dr.

Howes and Dr. Mishra) at least aggravated Plaintiff's medical condition, she has simply

failed to demonstrate, as to any of the moving Defendants, that level of obduracy

necessary to a finding of deliberate indifference.  Deliberate indifference exists when "the

official knows of and disregards an excessive risk to inmate health and safety; the official

must be aware of facts from which the inference could be drawn that a substantial risk of

harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  In other words, this prong is satisfied when a prison official acts with criminal recklessness, i.e. when he or she "consciously disregard(s) a substantial risk of serious harm." <u>Brooks v. Celeste</u>, 39 F.3d 125, 128 (6th Cir. 1994) (citing <u>Farmer</u>, 114 U.S. at 839-840).  Mere negligent inattention to a prisoner's request for assistance does not offend substantive due process under the Fourteenth Amendment, <u>Davidson v. Cannon</u>, 474 U.S. 344 (1986).  It is incumbent upon one asserting an Eighth Amendment claim to prove that the decision to provide no, or substandard, medical care was deliberate or knowing.  On this record, I am persuaded that no reasonable fact finder could find that the subjective element of deliberate indifference has been established.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976).

For all of the above reasons, I recommend that Defendant's Singhal, Burch, Hutchinson and Correctional Medical Services' Motion for Summary Judgment be granted.

## III.  <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981), <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>Howard v. Secretary of HHS</u>, 932 F.2d 505 (6th Cir. 1991).  Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  <u>Smith v. Detroit Federation of Teachers Local 231</u>,

829 F.2d 1370, 1373 (6th Cir. 1987), Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                                    s/Donald A. Scheer
                                                    DONALD A. SCHEER
                                                    UNITED STATES MAGISTRATE JUDGE

DATED: July 2, 2009

---

## CERTIFICATE OF SERVICE

I hereby certify on July 2, 2009 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on July 2, 2009: **None.**

                                                    s/Michael E. Lang
                                                    Deputy Clerk to
                                                    Magistrate Judge Donald A. Scheer
                                                    (313) 234-5217